Our first case for today is 23-1035, Realtime Adaptive Streaming v. Sling TV. Mr. Wang, please proceed. Good morning, Chief Judge Moore, and may it please the Court. Realtime's Section 101 position was not objectively baseless in January 2021, and there is a significant disconnect from the Court's subsequent exceptionality finding and the facts and record, the contemporaneous facts and record that existed in the case. Okay, well, I'm just going to kind of cut to the chase. So the District Court came up with a number of what he referred to as red flags that ought to have alerted your client to the notion that they shouldn't have proceeded. I have problems with lots of them. I probably don't need to spend my time talking about that with you. I'll talk about that with the opposing counsel. But my problem for you is one of them seems quite legitimate and very strong, and that's the first one. He discusses it on Appendix Page 4 and Appendix Page 5, and that's the fact that you should have realized by the time this day was lifted that Claim 1 of the 610 patent and Claim 15 of the 535 patent are so similar as to be substantially the same. And he pointed to a claim chart that compared the two. That claim chart's the same thing that appears at Page 28 of the red group. The claims are identical but for the tiny little portion that talks about throughput of the communication channel. So why isn't that standing alone without anything more, a sufficient basis to affirm the District Court? Thank you, Chief Judge Moore. There's a significant difference in that claim because the core of the claim, highly simplified, of the 610 patent describes selecting a compression algorithm based on throughput and a data parameter. And Claim 15 of the 535 patent doesn't have any concept of throughput. It just has a data parameter. And this is a material difference because the claimed invention of the 610 patent is the one that's described in the abstract of the patent that talks about the problem of bottlenecks, detecting and alleviating bottlenecks. It's the embodiment described in Figure 2 of the 610 patent and also in Columns 11 through 14 of the specification. When you look at the claim, it's determining a parameter, selecting from one or more algorithms, and then compressing data. The throughput is of the same nature, isn't it? These are abstract ideas. And why shouldn't we defer to the District Judge? After all, that was his discretion. He had reasonable basis. So, his decision. Thank you, Judge Lurie. If I could give two responses to that question. It is materially different because the data parameter is something that's determined by looking at the data block, whereas the throughput parameter is a varying parameter of the system, a detected feature of the system. And that's what makes it similar to visual memory. As the Central District found when it likened Realtime's other related patents, where it talked about the system being able to detect an operating parameter and increase the flexibility and performance of the system. I think the point both judges have tried to ask, and I'll ask it one more time, is how is the additional language that was put in any less indefinite? How did it make it any less indefinite? Well, the court here construed the throughput limitation to not just be throughput, but to be a specific narrow construction of the number of pending requests of the communication channel. But it relates to Section 101, Judge Albright, because you can see from the way that we argued it in our summary judgment opposition and even in our pre-notice letter, it was all about the difference, right? All of our arguments, it could not have been made for Claim 15 in a way that it was made, it could be made, and it was in fact made about the claims of the 610 patent. That's how you know that I'm not drawing a distinction after the fact. This is how we argued it. And it relates to 101 because it shows it's a technical problem, a problem of bottlenecks, a specific solution with the order combination of using two or more compression algorithms, at least one asymmetric algorithm, and selecting an algorithm both on a determined data parameter from the data blocks and the pending number of transmission requests. Counsel, it isn't just the 535 patent. There have been so many of these 101 cases going back to Alice. So just manipulating data electronically has been held in so many cases to be abstract ideas. Sure, Your Honor. I'm not here to re-argue the patent eligibility. We recognize that we lost on that issue. But that's the basis for his discretionary decision, right? That's not clear, Your Honor. I think it was pretty clear the judges identified these couple of red flags or a few red flags, and to the extent the court relied on the body of 101 decisions, the court denied Dish's earlier motion to dismiss in the case. Let me go. I'm not interrupting you, Your Honor. Okay. During the court, after the motion was dismissed, was denied, and you had the Markham hearing that you asked for, down the road, did the competing experts on validity address specifically the issues we're taking up about whether or not the additional language helped prevent it from being invalid under Section 101? There were competing expert opinions at the summary judgment stage, and so there was some opinion from their expert that the throughput limitation didn't make a difference. But another issue we have there, and with what the district court did, was this idea of stripping out the throughput limitation, this thing that comes right in the middle of the claim, not tacked on in a where in clause, but right in the middle of the claim and say this in itself is an abstract idea. And I think that both the district court and their expert did that, and we don't think that's consistent with 101 or what's proper for the analysis. I don't mean to take up everyone's time, but if we were to give you a minute or two to explain why you believe that the district court abused his discretion by finding this an extraordinary case, I'd like to hear why that. I have, as a district judge, my own opinions. I'd like to hear what you think as to why you don't think it was within the field of discretion to say this was an extraordinary case. Thank you, Judge Albright. So one is it was inconsistent with the district court's own prior rulings, and I have to bring this page to your Honor's attention. This is Appendix 1237, and this was the hearing on whether to lift the stay and continue litigation on the 610 patent. And in that hearing, the district court said to Dish that they've done everything they could to put off the day of reckoning as to the 610 patent. But a few lines down on that same page, on 1237, the court remembered back on its own to Dish's earlier motion to dismiss, and it said, it told Dish, since I've already denied the motion to dismiss, the chances that I'm going to grant a dispositive motion are poor, to say the least, and you should be prepared to try your case and get it done in the next few months. And that is all that Realtime did in reliance on the court's orders. And so I think that that, Your Honor, Judge Albright, is one fact that wasn't taken into account by the district court judge. And also, if we look at the red flags that he relied on, Judge Moore did mention the first issue with Claim 15. But as I tried to explain, that involved stripping out the throughput limitation and not considering our arguments about the claimed advance, all of the arguments in our opposition brief, and additional red flags. I generally pride myself on reading the briefs on the record pretty well, and I don't remember you ever citing this page 1237 to me before. Did you cite it in your briefs, Kaz? It was cited, Your Honor. I can get you the pin site. I know at least it was in a footnote in our reply brief, and it's also in our statement of the case. But that page was cited, and that's why it appears in the Joint Appendix. Do you want to say the rest of your time for the model? Sure. If I could make one last point. So the second red flag that the district court relies on is the adaptive streaming case. I'm not going to go into that much detail, but one striking thing I noticed when I was reviewing the briefing in the case is that real time, we cited the visual memory case 12 times in our opposition to summary judgment and in the fee motion. And DISH submitted four briefs in those two motions, and the district court issued two orders. In those six orders, visual memory is mentioned exactly once in a footnote in a meaningless way. So we are in the position where we, in good faith, distinguished a non-presidential federal circuit case. We spent a paragraph or more on it. And from our point of view, neither DISH nor the district court distinguished this precedential case that we relied on at length. And so how can our Section 101 position be objectively baseless in view of that? I will reserve the rest of my time. Thank you very much. Mr. Scharzer, please proceed. Good morning, Your Honors. Adam Scharzer with Fish and Richardson on behalf of the appellees today, and may it please the Court. Your Honors, we see a shift from the blue brief to the gray brief because in that intervening time, this Court had determined with a Rule 36 judgment that Judge Jackson's judgment on 101 and eligibility at summary judgment was correct and adopted his order. So we see real-time shift in its gray brief to a different focus of its arguments, that special words don't appear in the district court's order, words like baseless or frivolous. I find this very persuasive, so why don't we just go to page 7 and 8 of the district court opinion. This is where I'm troubled. I'm troubled on page 7 and 8 because, honestly, I don't think there's anything on page 7 or 8 that makes any darn sense to me in terms of supporting a finding of exceptional case or extraordinary behavior. So page 7, when the district court says, On February 11th, in a letter of the real kind, the counsel defendants reiterated their unrelated position and said you should dismiss. Okay, well, that is every case. That's every single case. I've never seen a patent case where the defendants don't send a letter to the plaintiff at some point in time saying you've got a bad case and you should dismiss. There's nothing else there. There's no other statement in there by the district court. I don't see how that constitutes a red flag. The district court doesn't say that letter laid out with clarity a particular thing, a patent you should have been aware of. It is just the fact of the letter. So in this particular circumstance, we sent the letter, which is in the appendix at 2146, and in that letter we laid out the orders that your Honor, Chief Judge, mentioned with respect to the orders in the Google case from the Central District of California and the Netflix case in the District of Delaware. We also laid out this court's decision in the adaptive streaming case. And, of course, adaptive streaming, when read, a number of precedential cases of a Cognacorp, 2A Media, Voight Technologies, and others, which hold that claims, much like the claims that Realtime pressed all the way through summary judgment into the eve of trial, claims regarding compression and manipulation of data are simply abstract. Okay, I review the district court's backgroundings for clear error, correct? In this case, you're reviewing, right, for clearly erroneous fact findings. Right, but I review the fact findings the district court made on the basis of how he made them, or she made them, but it's a he in this case. So I don't look, unlike a jury verdict where I actually have to scour the entire record to see if there's substantial evidence to support sort of a black box verdict, we don't do that with district courts. We hold them to their actual opinion, and then we look at their fact findings and determine if there's clear error. With regard to the letter, this district court just seems to think the fact of a letter is a red flag. I don't see any analysis in the district court's opinion itself about the qualitative merits of the letter or the strength of the letter or the details in the letter that ought to have put the patentee on notice. Am I missing something in his actual opinion? In the actual opinion, no, I don't think you're missing anything. The court does cite the fact that the letter was sent putting real-time on notice of the concerns with respect to Section 101, and ultimately the letter also states that we would seek fees on the basis of these prior decisions, Netflix and Google. That's what the letter says, actually, but none of the district court's opinion says anything about that. It does not. You're correct, Your Honor. Let's move on to the next one, because I can only review opinions and the bases in the opinions. I don't scour the record for additional bases that might have supported it that the district court didn't rely on. Well, respectfully, Your Honor, this court does review judgments, not opinions, from Strataflex, I think all the way back to 1983. So when we're looking at this record from the abusive discretion standard, there is plenty in this record that supports the judgment. Is it your view that I look at the record for abusive discretion, or is it your view that I look at the decision from the district court for abusive discretion? You are looking at the district court's decision. That's what I understood, too. Correct, and we're still looking at the judgment, and we're ensuring that the judgment is supported by the opinion itself, and the opinion itself does support the judgment here, because we have the opinion that focuses on the Netflix and Google decisions. Let's go back to what I want to do, which is on page 7. Can we go to the next red flag that he articulated on page 7? This has to do with the PTO examiner conducting an ex parte re-exam on the 610 patent. Why in the world would a re-examination that is directed to obviousness have any strong implications for whether a patent is ineligible, such that they should not have continued to pursue their patent in that case? In this particular case, there were a number of arguments made with respect to Alice Step 2. At least preliminarily, the examiner had twice determined that the 610 patent was not novel. There was no unconventional solution necessarily with the claims that were going to support the claims at Step 2, when we know that when you're doing a Step 1 analysis under Alice, these claims clearly cover abstract concepts in and of themselves. So were they going to be able to survive Step 2? This court was cognizant of the full and complete Alice analysis, and I believe that's why the court cited here the examiner's findings. Well, were these different claims? The claims that were rendered invalid under the re-exam, were they different claims than the claims that were asserted in addition in this case? They were the same claims. The same claims. Yes. And they were held ultimately to be invalid under the re-exam, is that right? Yes, Your Honor, that's correct. So, I'm just a tiny bit confused. I thought the district court here held them ineligible. The district court did hold the claims ineligible, correct. Now I'm really confused. I must have missed something procedurally. How do you kill claims twice? Well, so in the order of operations here, the district court first issued the 101 finding summary judgment that the patent claims were ineligible. And then as the appeals from that summary judgment determination proceeded, there was an ex parte re-examination that continued on at the patent office, and ultimately the examiner's determination was appealed up to the board, and the board affirmed the examiner's determination during the pendency of the briefing in these appeals that the 610 patent was invalid for prior art reasons. 103 was the primary basis for invalidity of the 610 patent claims at the patent office. Okay, so the PTO re-exam continued even after the district court rendered these claims ineligible. That's correct, Chief Judge. Is that normal? I mean, does the PTO not, once proceedings have been killed somewhere else, or once a patent's been killed, they don't stay in proceedings, they keep going? They don't. They typically keep going independently. We are under obligations to inform the PTO of things that go on at the district courts, and so we do that. But the patent office is not required to stop its re-examination once it picks it up. Is that because theoretically the district court decision could be reversed? Absolutely, Judge Lurie. This court could have reversed Judge Jackson's summary judgment decision on 101, but did not in this case. Chief Judge, I want to make sure I've answered all of your questions with respect to pages 7 and 8. Okay, so what about the expert? Why should, I mean, every single case, you have an expert, they have an expert, there's always experts on both sides. Why should the fact that an expert testified, which is true in every single case, necessarily, my concern with this is, I'll tell you what, I think they should have known, and I think they should have stopped. So there you go, right there. I think the litigation should have been stopped, and I think they were on notice. But my problem is I have a district court opinion that points at a lot of stuff that is present in every single case and not specific to this case, and I don't think in every single case these kinds of things that this district court pointed to would justify attorney's fees. In fact, there's always an expert on both sides, and so I don't think the fact that there was an expert on both sides carries any water. So that's my concern. My concern is I think they not only have bad claims that are ineligible, I think they have bad claims they should have known were ineligible, at least as of the time of 535. But then I have this district court opinion that makes that one of these bases, but he has all these other bases that are present in every single case that I don't think would support an exceptional case finding. And the worst part for me is that on page 8 he expressly and unequivocally says it's taking all of these things together that result in this exceptional case finding. He says it's the fatality of the circumstances, and he says my point is by carrying on despite these numerous danger signals, I find this case exceptional. So my problem is one of them I agree 100% on, and I think it alone would have justified what he did here. But that isn't the fact finding this district court made. His fact finding was the collection of all of them, some of which I don't think are legitimate, support the conclusion. So I don't know what to do. Mr. Scharzard, you've been before me before. You know, I just put it all out there. This is your chance. Tell me what to do about that, and then he'll have the opportunity to tell me what to do about that. That's exactly where I stand. Thank you, Your Honor. I appreciate the candor. In this particular circumstance, this judge took the idea of the totality of the circumstances test, which is, you know, what we take from Octane now in 285, and ran with it and looked at the totality of the circumstances. I would stand here today. What do we do if so the question is if there's one of the six that, and I may not be as far as the other judges in feeling one way or the other about what the plaintiffs should have done, but if we believe that one of the six or more was a valid reason, but many of them were not valid, and I'm sure if I had a dollar for every time I had a daubert on an expert, I would be wealthy, and in this case, the court denied the daubert. I think, as my understanding, you all, to their validity, invalid expert, they respond. You daubert that expert, and the court denies the daubert, but it's one of the factors. Dr. Bovic is one of the factors that he says is a reason this was extraordinary, and so what do we do when the district judges said, I find this case extraordinary for these six reasons, and it seems pretty clear to me it's the totality. You're right. It's the totality of all six, but if on many of them, at least I don't think that they would rise to the level of it meriting an extraordinary case. What do we do now? Well, here, Your Honor, what we do is we turn to the extreme discretion that is owed the district court in these types of fee determinations. As the Supreme Court has told us, Now, what were you doing for clear error fact findings? He made a fact finding about Dr. Bovic being a red flag. I don't agree with that. So what do we do when that's the case, when he has made fact findings that I think are wrong, and those fact findings contributed to his conclusion, which is also a question of fact about whether this is an exceptional case or not. Right. Standing alone, I think that the expert's opinion, standing alone is not enough to support a 285 fee award. You're correct, Chief Judge. In every case, there are competing expert opinions that go both ways. And so had the district judge here said this factor, standing alone, is sufficient to sustain a fees award, I think that would probably be problematic. But that's not this record, and that's not his opinion. This opinion, and the judgment that this is an exceptional case, can be sustained on the basis of the Netflix and Google decisions coming earlier, and this Court's adaptive streaming decision coming earlier. And we have seen this Court affirm cases in similar postures. So the Inventor Holdings case is one of those cases where this Court affirmed the decision to award fees because the claims that were at issue were very close to the claims that were held patent ineligible under Alice. And there were a number of other circumstances. For example, the district court had not endorsed the patent eligibility of the claims at the Rule 12 stage. Just out of curiosity, he gave you fees going back to what point? When, where? Because he didn't do the whole period. He said, am I remembering right, that he didn't give you fees from pre-stay? It was only post-stay? You're correct, Chief Judge. So what is the timing of the fees? The timing of the fees are from the lifting of the stay in January. Let me make sure I get the date right. I believe it was 2021. But it's essentially January through July, I believe it was, of when this case was proceeding. When is it you think they should have known they should dismiss and not proceed? It would have been immediately after the Google and Netflix decisions. I don't recall which one came earlier, but it would have been after those district court decisions holding the 535 patent claim 15 ineligible. Do you remember when those occurred? It was during the stay in this case. I apologize. I see that I'm out of time. I didn't complete my answer. Yes. It was during the stay of this case. So during the stay, you believe at that point, they should have known that coming out of the stay, they should dismiss? Correct. So then why, just out of curiosity, I mean, you have a district court that denied the 12B6, but of course that was before the Google and Netflix cases, right? Then you have the Google and Netflix cases. Then you have this hearing, the status conference on January 15, 2021, which is what he referred to on page 1237, which honestly I missed. My clerk has said to me, it's cited in putting up one of the great briefs, but I had missed it. But so coming out of after the stay in the status conference, he is signaling to both parties, not only did he deny the 12B6, but he is also likely to deny any dispositive motions. I don't know at that point if I were done, why would I immediately, but oh, you know what? I'm going to dismiss. So the district court is telling them on page 1237 that the chances that he's going to grant your dispositive motion on 101 is, quote, poor. You have a poor chance. Now, of course, it turns out that's not true. But so as of that date, why do you think they should dismiss when they've got a district court judge telling them, I deny your 12B6 on 101, and the chances that I'm going to grant a summary judgment motion on the same thing are very poor? I don't know. Mr. Scharzer, if you're in your shoes at that point, you're walking out feeling pretty good, aren't you, about continuing this litigation. Why would you dismiss when the district court judge you're in front of just told you that? Well, this district court judge, Judge Jackson, did not have the benefit of having read the Google decision or the Netflix decision or this court's decision in adaptive streaming at that point in time. And so this district judge, I think, was speaking off the cuff at the moment without a full record of what had occurred earlier and before. We'd put real time on notice of that record, but they simply chose not to dismiss. And this court, Judge Jackson, in a similar vein, had put real time on notice of the fees that could be accrued in this case. And that was at the scheduling conference when the district judge decided to also hold the 101 hearing on the motions to dismiss. This is in your appendix. When did you make the judge aware of the Google and the Netflix cases? We would have first made the judge aware of those cases in... It would have been a notice. I believe it would have been a notice of intent to file a summary judgment motion on 101. That probably would have been the first briefing before the court. You wouldn't have made him aware of those cases during the stay when they came out? You wouldn't have sort of... Is there an equivalent of what you have here when you file a notice of new cases, notice of new evidence, notice of new information? You wouldn't have made him aware of them during that time? We did not. I guess parties file notices all the time in the district courts for various reasons. But there wasn't necessarily a procedural mechanism to do so. I hesitate to call it ex parte contact. It would have been sort of hypothetical. But it's certainly not something that we would typically do. So at the time of this January 2021 status conference when you made this comment about not likely granting summary judgment, he had not been made aware by you all of the Netflix or Google decisions yet as of that time. So when I scour this record, I'm going to find out that you did not make him aware prior to that date of those decisions. Is that correct? That's correct. We did not tell the judge that there was a Google decision adverse to real time, that there was a Netflix decision adverse to real time. And I'm asking you because you're saying when he made that statement it was off the cuff and he didn't have the benefit of Google and Netflix. And I just want to make sure that turns out to be true in this record. Yes, I believe that's true. If you're uncertain, you can say you don't know. You're not going to, you know. Well, I'm certain about what we filed, but I'm not certain about what real time said. Real time did drop its 535 patent, I believe, concurrently with requesting that the district court lift the stay. But for obvious reasons, real time did not highlight for the judge that there was the Google and Netflix decision or the adaptive streaming decisions. May I ask one more? Yes. So, again, going back to the fact that there are six issues here, if, when we leave, which of the six was the, I think it's like saying there's an off ramp where the plaintiff should, where, what exactly happened of the six that at that point the plaintiff should have known to get out of the case, to drop the case, and otherwise you would be entitled to this being an extraordinary case. We have the judge, I occasionally, I'm told, say off the cuff things, maybe I'll be more careful in the future, but we have this evidence in the record. Give us the bright exit ramp of the six that is the time when the plaintiff should have known to drop the case or they would be subject to the possibility of extraordinary fees. I'll give you three red flags, Judge Albright. The Google decision and Netflix decisions, that's one red flag. So, you ask, as of the time, those are just published. They should have said, okay, and you may be, but we're out. I mean, we have these opinions, we look at the, I think, is it the 535 patent, you know, we should quit now. They should have known from those opinions to quit at that point. That's a, yes, Your Honor, that's a fair characterization. TORUS IP requires patentees to continually assess the viability of the claims and the ongoing claims in their case. And TORUS IP related to the infringement claims in that case, but TORUS IP was specifically extended by Inventor Holdings, this Court's decision, Inventor Holdings, where this Court cited TORUS IP stating that in the patent eligibility context under Section 101, you must continually assess the viability of your claims. So, at that point in time, those earliest Netflix and Google decisions would be the earliest point in time. Then there would be the adaptive streaming decision from this case, I believe, from this Court. I believe that was circa 2019, which was the... I hate to belabor this argument because it's gone on too long already, but why do you think, I was not very persuaded by the adaptive streaming. It's a non-precedential decision, not even on data compression technology. What is it about that decision? I didn't go back and read your arguments to the District Court, but I didn't see anything particularly persuasive in your arguments to us about why that decision should have somehow put real-time on notice that it's unrelated patents directed to a different kind of technology ought to be dismissed. So, the claims at issue in adaptive streaming relate to data compression. This Court refers to it in its opinion as format conversion, where you're taking data that's in one format and converting it to another format, which ultimately results in a format that requires less bits. So, at the end of the day, it still is data compression. Is it your view that all data compression... What about DDR? Is it your view that all data compression patents are ineligible and people should know not to assert them? No, no, that's not my view. Well, you didn't do some sort of side-by-side analysis of adaptive streaming and the claims there, and the claim in this case to show that they're virtually identical and therefore people should have not pursued it, did you? Well, that would be real-time's burden under TORUS IP. As soon as we put them on notice of adaptive streaming, they need to take a look at adaptive streaming and understand the implications for the claims that they continue to assert. Adaptive streaming also cites other cases as well. The Voight technology case, which is... Okay. All right, well, your time is definitely up. Let's let Mr. Wayne have some rebuttal time. We went way over with Mr. Chartard. We need a little extra. Mr. Wayne can have it. Thank you, Your Honor. Various points in no particular order. Adaptive streaming is very different. If you look at the specification in that case, it talks about prior art methods of yelling and banging drums as a fundamental communication practice. So it had a different claim to advance. It was very distinguishable. When DISH sent us that letter, they didn't do anything during the whole time the case was stayed, about two years. And they didn't file any motion or raise the patent eligibility issue before the court until the time of summary judgment. And so that's part of the facts and circumstances of this case that undermines their hindsight assertion that we were so doomed we needed to grant a motion to dismiss against ourselves that was not filed or pending. And it is true that sometimes a patentee needs to assess the viability of its case, but not when there's red flags in other or unrelated cases. We didn't have a chance. If we disagreed with adaptive streaming or how they're applying it, we can't appeal that case. Likewise, for infringement, if there's a claim construction that weakens your infringement case, you have the ability to stipulate to non-infringement and appeal the claim construction. What about that? I mean, after Google and Netflix where virtually identical claims in your 535 patent were found to be ineligible, why wasn't that enough to put you on notice that you ought to dismiss as to the 610? Your Honor, if you look at the Google order and if you look at it in full, any fair characterization, any fair reading of that order is not something that would cause a reasonable litigant to feel like they were doomed. It denied the motion for dismiss for three related patents and all claims of the 046 and the 477 patents. We relied on the Google order at length in our summary judgment opposition and in our pre-notice letter. I get it, and I appreciate the argument that you've made that related patents, each claim is directed to a different invention. But the problem for me is that Claim 1 of the 610 and Claim 15 of the 535 are virtually identical. But they're not, Your Honor, with respect to the throughput limits limitation. It's an input to selecting the algorithm. That's just another piece of data. That's all it is. You're just manipulating data, and you've just added one additional piece of data. Judge Moore, again, I would relate it to the claimed advance. It was a key part of our Step 1 analysis. It was a factual dispute we raised for Step 2. I'm not making this up after the fact. You could look at our briefing to see our good-faith argument there. I'm not here to convince the Court that we were right. We were wrong. But we made very credible arguments that were supported by the facts, that were supported by the Court's contemporaneous rulings. We relied on the Court's claim constructions, as we said we were before. We lost, but that doesn't make this case exceptional. The Court, in the end, found Dish's arguments and cases more persuasive than ours. But that just makes it like any other case where we lost. And there's no bad faith. I don't think either Dish or the District Court have ever identified a single argument that we made that was frivolous, right? That we were presenting an invalid argument or we misrepresented any facts. We did not do that. And, Judge Moore, you asked several questions about the 6-10 re-exam. Just a few points there. It was not even a re-exam decision. It was a non-final office action rejection that had occurred before the District Court's fee order. And the 6-10 patent was under a different claim construction standard and a completely different interpretation and claim construction of the throughput term. That was way broader than what the District Court had here. I think I can't do it better than we did in the briefing. We went through each of the red flags and we showed how they were either not legally relevant to the patent eligibility determination for the 6-10 patent or were a clear error in the way that the District Court relied on them. And, Judge Albright, you were right. The court just says that here, in my totality of the circumstances of these five or six reasons, I conclude that this is an exceptional case. So I think there would be quite a bit of mischief if there were an affirmance that said that you can just send opposing counsel a five-page letter and in two paragraphs on the very last page you can assert something or you can hire an expert and not put them on notice. And maybe I'm just not following either, but it seems like the decision with respect to the re-examination was out of order in terms of the conduct that the court found would support it being an extraordinary case. It occurred after. I mean, he brings it in to support it post. It seems like it was post the conduct that it would have gone to support it being an extraordinary case. Yes, it was post, and that's another reason we have an abuse of discretion here. The court, multiple times in its orders, said it was not considering this re-exam. On page 1237 that I mentioned before, the court said, I don't care about the re-exam. I don't know who put the PTO up to this. I don't care. And then to turn around after the fact and to mention this as a basis for a $4 million fee award we think is just beyond the pale. Okay, thank you, Mr. Wang. I think both counsels' cases take another submission.